PARSONS (UNITED STATES v.). See Cases Nos. 16,000–16,002.

---

## Case No. 10,783.

PARTER et al. v. The FRIENDSHIP.

[Oliver's Forms (Ed. 1842) 492.]

District Court, D. Massachusetts. Sept., 1831.

### SALVAGE—COMPENSATION—SALVORS AS JOINT OWNERS.

[The ship Friendship, laden with a cargo of pepper. was seized off the coast of Sumatra, by the native Malays, and upon an appeal for aid by the master, the libellants succeeded in rescuing the ship and cargo from the pirates. *Held*, that the libellants are entitled to two-fifths of the net proceeds of the sale of the ship and cargo, and that the expenses of the homeward voyage, including the wages of the crew, are to be borne by them as joint owners, and to be deducted, together with all the expenses of the suit, from the gross amount in determining the net proceeds.]

[Cited in The Henry Ewbank, Case No. 6,376.]

In admiralty.

Benjamin Merrill, for libellants.

Leverett Saltonstall, for respondents.

DAVIS, District Judge. This is a suit for salvage, instituted by Jeremiah Parter, master of the ship James Monroe, of New York, Horace H. Jenks, master of the brig Gov. Endicott, of Salem, and Michael Powers, master of the brig Palmer, of Boston, in behalf of themselves and the owners, officers, and crews of said vessels, respectively, for the recovery of the ship Friendship and cargo, on the 9th day of February last past. out of the possession of certain assailing thieves of the barbarian tribes, called Malays, on the coast of Sumatra. The ship Friendship was seized by surprise by the natives, on the 7th of February, at a place called Quatta Mattoo, on the coast of Sumatra; the captain, Charles M. Endicott, with four men and his second officer, being at that time on shore, engaged in weighing pepper, part of the destined cargo of the ship, and with which commodity she was then nearly fully laden. It was soon perceived that the pirates were of such overpowering force, that every possible exertion which Captain Endicott could make in his forlorn situation, with all the aid which he could command at that place, would be unavailing; and his only hope for the recovery of his ship and cargo, and for saving the lives of the men on board who might be surviving, was by procuring the assistance of the libellants. their ships then lying at a place called Muchee, about twenty-five miles from Quatta Mattoo. Captain Endicott immediately proceeded to Muchee in his boat, and his call for relief was generously and promptly regarded. The libellants' ships immediately got under way for the place of outrage; and on the 9th, after a spirited conflict with the Malays in possession of the Friendship, recovered the ship, with the greater proportion of the cargo; and after rendering afterwards all necessary assistance to Captain Endicott, delivered the ship and cargo into his possession.

The particulars of the conflict, in which the libellants were engaged, are minutely and faithfully stated in Captain Endicott's deposition; and there can be no question that the whole transaction presents a case of distinguished merit on the part of the libellants. who, with the assistance of Captain Endicott and his surviving crew, three of the men having lost their lives by the natives, rescued the ship and cargo from their desperate situation, with undaunted resolution and imminent hazard. It would have been gratifying, if this manly and meritorious service could have been recompensed by voluntary offer, or by mutual agreement. But circumstances have rendered an adjudication indispensable; a course which has been taken without any disinclination, it is presumed, on the part of the owners, to make all just and proper satisfaction for the services which have been rendered. It is left to the court, after a very satisfactory exposition of the case on both sides to determine on the amount of salvage to be awarded to the libellants.

The general principles regulating the amount of salvage are very familiar. In their application, however, we find great diversity in the rates, leaving no very precise guide in the various cases presented—in the books, foreign and domestic; each case depending on its own particular circumstances. The case of The Trelawney, 4 C. Rob. Adm. 223, is, in many respects, analogous to the one before the court. But the risk and danger to those who attempted the rescue of that slave ship, and succeeded in the attempt, was less than in this case of the Friendship. The Malays, it is believed, being in possession of arms, and expert in their use, would be a more formidable foe, and of better capacity to manage a ship, than the negroes who had possession of the Trelawney. Besides, the assailants who had possession of the Friendship had the countenance and aid of the authorities and people on shore, who refusing all compromise, kept up a fire from their fort with twelve guns, on the rescuing ships.

In awarding salvage in the case of The Trelawney, Sir William Scott gave one tenth part of £10,000, the estimated value of the property saved. The decision appears to have been influenced by a consideration of the implied engagement of vessels, concerned in that trade, to assist each other in case of extremity, especially in the exigency most likely to occur in that inhuman traffic,—an insurrection of the slaves. How far the character of

the pepper voyages on the coast of Sumatra, would occasion similar understanding or engagements, among ships engaged in it, I am unable to estimate. No such understanding is proved or announced to exist. I am led to believe, however, that something of the sort may be rationally supposed; but the circumstances leading to such implied understanding are not of so decisive a character as in the slave trade. One ground of salvage, which is always of considerable influence, and which is eminently applicable in this instance could not be urged in the case of the Trelawney. The slave trade was, indeed, at that time, sustained by the law and policy of Great Britain. But the spirit which has since abolished it in that empire, was doubtless then in generous, though unavailing exercise. The encouragement of such a trade, it is presumed, would not even then have been pronounced by Sir William Scott, or any British judges, proper ground of enlargement of salvage.

A deliberate view of the features of this case, which are honorable to all the parties, united with a proper regard to the great interests of navigation and commerce, have in combined consideration, led me to pronounce, that the libellants recover two fifth parts of the whole property saved. The ship and cargo thus saved, were delivered to the master, Captain Endicott, on the coast. I consider him, however, as receiving the property on trust, and that the libellants are to be regarded as joint owners in the homeward voyage, and are to receive two fifths of the net proceeds of the sale of ship and cargo, sustaining, of course, their proportion of the expenses of homeward voyage. The charge of insurance, made in the respondent's statement, must, I think, be disallowed; and the wages of the crew are to be charged to the joint concern for the homeward voyage only, to be deducted, together with all the expenses of the suit, from the gross amount in determining the net proceeds.

NOTE. For a concise, practical view of the subject of salvage in general, see Law Summary, 339. As a general rule, a party not actually occupied in effecting a salvage service, is not entitled to salvage. The principal exception is in favor of owners of vessels, which, in rendering assistance have been diverted from their proper employment, or have experienced a special mischief. The Vine, 2 Hagg. Adm. 2; The Baltimore, 2 Dod. 132. A passenger on board the vessel saved, who assists in saving the vessel, has no claim for salvage. The Branston [2 Hagg. Adm. 3], cited in the case preceding. But where a vessel has been wrecked, and part of the crew were taken on board of a vessel, which afterwards was thrown into a very dangerous situation, from which she was rescued, and the crew so taken on board contributed to that object, by working day and night, it was thought they might be entitled to some remuneration. The Salacia, 2 Hagg. Adm. 269. The

part of a ship's company that go on board a distressed vessel, are no more entitled to claim salvage, than those who remain behind, provided they are equally ready to go. The Baltimore, 2 Dod. 132. Where two vessels sail together under a special agreement to give mutual assistance, there can be no claim for salvage between them on account of services rendered. The Zephyr, 2 Hagg. Adm. 43. Where a vessel in distress agrees with the master of another vessel for assistance for a sum certain, the court cannot entertain a claim from the owner for salvage. The Mulgrave, 2 Hagg. 77.

As to what constitute salvage services, it was held, in the case of The Emulous, that whenever the service has been rendered in saving property on the sea, or wrecked on the coast of the sea, the service is a salvage service. Whether the services have been rendered for an agreed compensation, or upon the ordinary terms of a quantum meruerunt, the services are still salvage services, and if the compensation is stipulated, it merely fixes the rule, by which the court will be governed in awarding salvage. See [Case No. 4,480]. In that case, the circuit judge, Story, observes: "Contracts made for salvage services are not ordinarily held obligatory by the court of admiralty, upon the persons whose property is saved, unless the court can clearly see that no advantage is taken of the parties' situation, and that the rate of compensation is just and reasonable. The doctrine is founded upon principles of sound public policy, as well as upon just views of moral obligation. No system of jurisprudence, purporting to be founded upon moral, or religious, or even rational principles, could tolerate for a moment the doctrine, that a salvor might avail himself of the calamities of others, to force upon them a contract, unjust, oppressive, and exorbitant." In the case of Schutz v. The Nancy [Case No. 12,493], Judge Bee held all such agreements void, as made under a species of duress.

Salvage is forfeited in cases of embezzlement, or concealment of the property saved. See the case of the ship Blaireau, 2 Cranch [6 U. S.] 240. So even by gross neglect. The Bello Corrunes, 6 Wheat. [19 U. S.] 152. In that case, Mr. Justice Johnson observes, in delivering the opinion of the court: "As to the claims of the salvors, it may be remarked, that maritime courts always approach them with favor. Yet, in proportion to the inclination to favor where there is merit, is the indignation with which they view every indication of a disposition to take advantage of the unfortunate. Spoliation, and even gross neglect, may forfeit all the pretensions of salvors to compensation." See, also, the remarks of Story, J., in the case of The Boston [Case No. 1,673]. To entitle a person to salvage, the danger must be real and imminent, and not merely speculative. But it is not necessary that it should be such, that escape from it by other means is impossible. See Talbot v. Seemen, 1 Cranch [5 U. S.] 1. The salvors have a lien on property saved, so long as it remains in their possession. If they deliver it to the owner, though the lien is gone, the right to salvage remains. If the owner refuses to receive the property, he is not answerable for salvage, the property alone being then answerable. See Brevoor v. The Fair American [Case No. 1,847].

The salvors are admitted as witnesses from the necessity of the case, notwithstanding their interest. But their competency is limited by that necessity; since they are not competent witnesses as to facts occurring after the property has been brought into port. The Boston [supra].